The Honorable Fred Van Sickle

Steven C. Lacy
Lacy & Kane, P.S.
P.O. Box 7132
East Wenatchee, WA 98802
(509) 884-9541

FILED IN THE
U.S. DISTRICT COURT
Eastern District of Washington

MAR 18 1999

JAMES R. LARSEN, Clerk
_____ Deputy

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JAMES M. BLACKFORD,                )
                                   )
                Plaintiffs,        )    NO. CS-98-032-FVS
                                   )
        vs.                        )    PLAINTIFF'S STATEMENT
                                   )    OF SPECIFIC FACTS IN
BATTELLE MEMORIAL INSTITUTE,       )    OPPOSITION TO DEFENDANT'S
                                   )    MOTION FOR SUMMARY JUDGMENT
                Defendant.         )
_____)

        In accordance with Local Rule 56.1 plaintiff submits the
following Statement of Specific Facts:

    1.   James M. Blackford was employed by the defendant,
         Battelle Memorial Institute, from August 10, 1992, until
         he was discharged by Battelle on June 23, 1997.
         **Blackford Declaration, #1**

    2.   Upon his discharge from employment Blackford, was given
         a letter which stated that "performance issues have
         resulted in an inability on your part to obtain and
         sustain project funding." **Blackford Declaration, #2**

    3.   No "performance issues" were identified by Battelle
         management and no explanation was given to Blackford

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -1-
c1:blackf-j\pleading\sspecfac

LACY
&
KANE
LAW OFFICES
P.O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

regarding the use of the term "performance issues" at the time of his discharge, and Battelle has refused to answer any questions about the nature of the discussions by management which led to the discharge decision. **Blackford Declaration, #3 and Deposition of Richard Neal, pp. 49-51 (Exhibit 1)**

4.   Blackford's last two performance evaluations indicated better than satisfactory performance on his part. At the conclusion of his evaluation dated December 16, 1995, his supervisor, Earl Heister, had given him an overall rating of "very good", indicating an employee who "Meets Battelle's high standards for the job category and is exhibiting continuous growth." On January 20, 1997, that same supervisor, Earl Heister, summarized Blackford's performance under the PERFORMANCE SUMMARY portion of the evaluation by stating, "Mike, you have continued to make progress this past 15 months both in your interpersonal style and cooperation on the project teams with which you have aligned during this performance period." Apparently due to a change in the format of Battelle evaluations, there was no overall rating assigned to Blackford by that evaluation. **Blackford Declaration, #4, Exhibits A & B to Blackford Declaration. <u>Contrary to Defendant's Fact #7</u>**

5.   Toward the end of his employment at Battelle, despite the improvement he had achieved as indicated by his evaluations, Blackford was finding it unexpectedly difficult to find project managers who would request that

LACY
&
KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

he be assigned to them on project work. He formed the understanding, on the basis of comments made to him by some of those project managers, that Mr. Heister and others in Battelle's management were sabotaging his attempts to find work on projects. **Blackford Declaration, #5** <u>**Contrary to Defendants Fact #7**</u>

6.    In one instance a project manager actually copied Blackford on an E-mail exchange between the project manager and Mr. Heister regarding the manager's desire to utilize Blackford on a project and the refusal of Mr. Heister to agree to allow funding for Blackford's participation. That project manager, James A. Wise, recounted in that E-mail that another member of the management team, Rick Chidester, had attempted to discourage Mr. Wise from using Blackford on his project, telling Mr. Wise, "We don't want him here. He's a troublemaker." **Blackford Declaration, #6, Exhibit C to Blackford Declaration** <u>**Contrary to Defendants Fact #14**</u>

7.    There was no formal or written employment rule or policy at Battelle requiring that employees such as Blackford maintain a certain level of funded participation in projects on penalty of discharge. **Deposition of Richard Neal, p. 24 (Exhibit 1), Mahan Deposition, pp. 12-13 (Exhibit 2)** Blackford was never presented with such a rule or policy in any formal sense prior to being told by Mr. Heister, on page three of his last performance evaluation that it was "Our cultural expectation" ...

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -3-
c1:blackf-j\pleading\aspecfac



LACY & KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

"that senior staff, like yourself, will keep themselves fully funded on project work." Blackford did complain to Mr. Heister on more than one occasion about the fact that he wasn't being efficiently utilized, requesting that management at Battelle simply assign him work or projects, rather than making him struggle to find project work in the face of what appeared to be opposition by management to his being selected for projects. **Blackford Declaration, #7**

8.  An active conflict between Blackford and Battelle management had occurred in early 1995 when Blackford was given, in his opinion, an unwarranted poor performance evaluation following activities on his part which he felt were protected by law.  Those activities had included efforts on his part in support of prevention of workplace discrimination, identifying an impending act of copyright infringement, pointing out a lack of management controls causing waste of federal funds, and possible misrepresentations by Battelle to the Department of Energy.  The substance of the criticism of Blackford in the negative evaluation he was given was that management perceived him to be spending "too much time analyzing and complaining about the . . . (workplace) . . environment and how you feel it limits your contribution." **Blackford Declaration, #8, Exhibit D to Blackford Declaration**

9.  Based on the belief that his poor performance review and

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -4-
c1:blackf-j\pleading\aspecfac



LACY & KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

additional attempts to discipline him at that time were being done in retaliation for his protected activities, Blackford had complained of such treatment in writing both to higher level management at Battelle and to Representative Richard "Doc" Hastings, outlining the nature of his protected activities and the retaliation he had experienced. **Blackford Declaration, #8 (duplicated in Declaration), Exhibits E and F to Blackford Declaration**

10. Management at Battelle recognized that Blackford's communication to management and to legislative authority gave him status as a whistleblower. **Deposition of Richard Neal, pp. 7-8 (Exhibit 1)** Moreover, management knew that Blackford was complaining of being harassed and subjected to retaliation for opposing discrimination at Battelle. **Deposition of Richard Neal, pp. 15-16 (Exhibit 1); Deposition of Robert Mahan, pp. 30-31 (Exhibit 2)** The Human Resources officer also recognized that Battelle policy required the development of an improvement plan and its implementation prior to any discharge, thus necessitating that a failure to succeed on Blackford's part be documented. **Deposition of Richard Neal, p. 9 (Exhibit 1)** <u>Contrary to Defendants Fact # 14</u>

11. After Blackford had registered the above-referenced complaints, he was summoned to a meeting with his supervisor and certain Battelle management personnel, including a personnel officer, Richard Neal, where he was



LACY & KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

strongly criticized and informed that he was being placed on a Corrective Action Plan. The tone of that meeting was hostile, with hostility being manifested on both sides. Based on his supervisor's reaction to that meeting, he was ordered to undergo a fitness for duty evaluation by a Battelle psychologist, which would have provided a means to terminate Blackford. However, the psychologist found Blackford free of any condition rendering him unfit for duty. Instead, the psychologist documented the ongoing conflict in the workplace which had precipitated the fitness evaluation. **Blackford Declaration, # 9, Exhibit G to Blackford Declaration**

12. Attempting to work within the system, although having little faith in its efficiency, Blackford acquiesced thereafter in a suggestion by Battelle Human Resources personnel that he submit his complaints to the Battelle Employee Concerns Program, which utilized a committee of other employees selected by management to hear employee concerns and make recommendations to management. Blackford was given no agenda or opportunity to prepare for his interrogation by that group. The process, so far as Blackford could determine, resulted in no significant independent investigation or attempt to resolve any of the issues he had raised. After a superficial review of the "conflict", the committee supported management's evaluation. However the committee concluded that the process utilized by management had not given Blackford an

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -6-
c1:blackf-[\pleading\sspocfac

LACY
&
KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

opportunity to correct his perceived intolerance and inability to work effectively with others. **Blackford Declaration, #10**

13. On June 27, 1995, Blackford was reassigned to a new supervisor, Earl Heister, who he was told would oversee his Corrective Action Plan. Mr. Heister had been involved in some of the issues leading to the earlier conflict. Nevertheless, Blackford became resigned to the idea that he needed to mend fences and become a well-accepted member of the Battelle community, despite his continued belief in the fact that management practices remained both wasteful and discriminatory. Blackford worked hard at those goals, with the result that he achieved them. **Blackford Declaration, # 11. <u>Contrary to Defendants Fact # 7</u>**

14. It became apparent to Blackford, however, that Battelle management was not content to forgive and forget, as illustrated by the way management personnel went about encouraging project managers to decline his requests to participate in project work. Blackford was not privy to all that was discussed between those project managers and Battelle supervisors, but he was informed by some project managers that supervisors were advocating his exclusion from projects. **Blackford Declaration, #12**

15. On April 9, 1997, Blackford reported to Bob Mahan about a serious discrepancy which he had discovered during an assignment. Blackford had been assigned some work

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -7-
c1:blackf-j\pleading\specfac



LACY
&
KANE
LAW OFFICES

P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

1    incidental to a report which Battelle was required to
2    provide to the Department of Energy detailing proposed
3    expenditures by Battelle based on actual expenditures
4    during fiscal year 1996, a function overseen by Mahan.
5    The figures were to be used by DOE for the preparation of
6    its budget proposal for the upcoming federal
7    appropriations.    In reviewing the figures that were
8    slated to be provided to DOE, Blackford noticed that they
9    seemed very similar to the figures that had been provided
10   the previous year, based on 1995 actuals.    Analyzing
11   further, Blackford determined that approximately 80
12   percent of the numbers were exactly the same as had been
13   reported in 1996 based on 1995 expenditures.    That was a
14   statistical impossibility, strongly suggesting that
15   Battelle was about to misrepresent to DOE the financial
16   figures to be relied upon.    After reporting that fact to
17   Mr. Mahan, Blackford was taken off that project.
18   **Blackford Declaration, #13, Mahan Deposition, pp. 23-25,**
19   **28 (Exhibit 2)**

20   16.  Mahan knew that if the DOE became dissatisfied in some
21        fashion with the reports or services he provided, that
22        such would have had an adverse impact on Battelle's
23        budget.  **Mahan Deposition, pp. 28-29. (Exhibit 2)**
24        Battelle's most significant sources of funding are two
25        government contracts with the Department of Energy.
26        **Mahan Deposition, p. 8-9 (Exhibit 2)**  Mahan, who had no
27        supervisory responsibility for Blackford since early in

28   PLAINTIFF'S STATEMENT OF SPECIFIC
     FACTS IN OPPOSITION TO DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT -8-
     c1:blackf-\pleading\sspecfac



LACY
&
KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

Blackford's career at Battelle, had started a private documentation file on Blackford, following discussions with Human Resources personnel, as early as November, 1993, in an admitted attempt to support a potential discharge of Blackford. Mahan has never kept such a file on anyone else at Battelle. **Mahan deposition, pp. 77-82 (Exhibit 2)** The Human Resource representative was a participant in the decision to discharge Blackford. **Deposition of Richard Neal, pp. 47-48 (Exhibit 1)** <u>Contrary to Defendants Fact # 15</u> **(It is hardly conceivable that Mr. Neal did not share all his information with the other management people in that meeting, the contents of which the defense refuses to disclose.)**

17. It was only after Blackford had been terminated from Battelle that he viewed evidence that clearly inferred a two year effort on behalf of Battelle management to get rid of him without making it appear to be illegal retaliation. A friend of Blackford provided him with a copy of a printout of a computer mail entry, called a news posting, written by Darren Curtis, a Battelle employee who was close personal friend and hunting buddy of Earl Heister, the supervisor who had fired Blackford. **Curtis Deposition, pp. 44-45, 55, 60-63, 66-80 (Exhibit 3)** Blackford later engaged in an E-mail exchange with Mr. Curtis in which Blackford reproduced for him his entry and requested that Curtis clarify it. **Blackford**



Declaration, # 14, **Exhibit H to Blackford Declaration** <u>Contrary to Defendants Facts #s 23 and 25 which are not facts but rather conclusions of law.</u>

18. In his entry Mr. Curtis refers to someone who over-analyzes things and causes costs to exceed the perceived waste. This person, according to Mr. Curtis, spends "8 hours a day posting messages, talking about their perception of problems in the hall (keeping others from their work) and complaining about never having enough funding to get their work done." He later informs his reader that his comments are "aimed at one individual who no longer works at PNNL (thank goodness)." His comment about that person is that, "The cost of firing a person like this amounts to two years direct charges to clients (or overhead), their manager's lost time, project deliverables slipping, and all other PNNL staff who wasted their time engaging in idle chit-chat. For an S&E III this amounts to about $500 K." **Exhibit H to Blackford Declaration** <u>Contrary to Defendants Fact # 24, 25, and 27, which are not facts but conclusions of law.</u>

19. Blackford's job title classification at Battelle Pacific Northwest National Laboratory was Scientist and Engineer III. From the time Earl Heister was assigned to oversee Blackford's Corrective Action Plan (June 27, 1995) until the date he fired Blackford (June 23, 1997) was almost exactly two years. **Blackford Declaration, # 16** <u>Contrary to Defendants #s 17, 19, 22, 23, 24, and 25, which are</u>



1

<u>not facts but conclusions of law.</u>

2  20.  Contrary to Defendant's Fact #16, Blackford has not

3      admitted that all of his allegations of misconduct by

4      Battelle are contained in his two memoranda, dated

5      February 22, 1995, and August 12, 1997.   Rather,

6      Blackford referred Defendant in his interrogatories to

7      extensive federal and state common law and statutes

8      prohibiting retaliation for protected activities which

9      are applicable to the treatment of Blackford by Battelle

10     from 1994 through the date of his discharge.   **Dunwoody**

11     **Declaration, Exhibit C (Answers to Interrogatories Nos.**

12     **3 and 1)**

13  21.  <u>Blackford objects and moves to strike Defendants Facts #s</u>

14     <u>17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27 on the</u>

15     <u>ground that they do not state facts; rather they recite</u>

16     <u>conclusions of law with which Plaintiff disagrees.</u>

17     <u>Evidence in this record shows that Battelle management</u>

18     <u>set forth on a purposeful scheme to hinder Blackford from</u>

19     <u>achieving work within the laboratory despite Blackford's</u>

20     <u>successful efforts at overcoming any behaviors that may</u>

21     <u>have previously interfered with his relationships in the</u>

22     <u>workplace.   Moreover, that evidence infers that</u>

23     <u>management was motivated by a motive to retaliate against</u>

24     <u>Blackford for being a "troublemaker", that is; opposing</u>

25     <u>discrimination, waste, fraud and mismanagement, and</u>

26     <u>whistleblowing.</u>

27

28  PLAINTIFF'S STATEMENT OF SPECIFIC
   FACTS IN OPPOSITION TO DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT -11-
   c1:blackf-j\pleading\especfac



LACY & KANE
LAW OFFICES
P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

Date this 16th day of March, 1999.

LACY & KANE, P.S.

By _____
STEVEN C. LACY, WSBA NO. 10814
Attorneys for Plaintiff

PLAINTIFF'S STATEMENT OF SPECIFIC
FACTS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT -12-
c1:blackf-j\pleading\stpocfac



P. O. BOX 7132
EAST WENATCHEE, WA 98802
(509) 884-9541

EXHIBIT

*1*

1           MR. DUNWOODY: That's right. I

2 believe it's on our privilege log. We of course

3 claim attorney/client privilege, since Steve Porter

4 was the legal counsel at that, so it is an

5 attorney-client privileged occasion.

6           Q.   (BY MR. LACY:) Do you claim a

7 privilege, then, in terms of discussing with me

8 anything that was discussed in that meeting, sir?

9           A.   Yes, I do.

10          Q.   So you intend to keep private

11 everything that was discussed in this meeting about

12 the reasons why to terminate my client? Is that

13 true?

14          A.   I'm going to keep --

15          Q.   You're not going to answer my questions

16 concerning what was discussed in this meeting about

17 the reasons why Mr. Blackford should be discharged?

18          A.   It's my understanding it's attorney-

19 client privilege.

20          Q.   I'm just asking you the question. Are

21 you going to claim the privilege and not tell me

22 anything about what was discussed in that meeting?

23          A.   Yes, I am.

24          Q.   All right. Was there ever any

25 discussions that occurred outside that meeting

1    wherein the decision-making process was influenced

2    by anything else, or was it influenced by solely

3    the discussion in that confidential meeting?

4         A.    The decision to go forward through that

5    process would have been made by the manager

6    involved.

7         Q.    Earl Heister?

8         A.    Yes.

9         Q.    So if I ask you what the considerations

10   were by this group that led to firing my client,

11   are you going to take the position that you're not

12   going to tell me that either because it comes out

13   of the discussion at that meeting?

14              MR. DUNWOODY:  Well, look, I

15   formulate the objections on attorney-client

16   privilege here, and we will take questions one at a

17   time and we will give you a ruling on them as you

18   ask them.

19        Q.    (BY MR. LACY:)  Okay.  Here's my first

20   question.  What was talked about at that meeting as

21   to the reasons why my client should be fired?

22              MR. DUNWOODY:  Objection,

23   attorney-client privilege.

24        Q.    (BY MR. LACY:)  What reasons were

25   determined to be justification for firing my client

                    RICHARD NEAL - by Mr. Lacy          50

1    at that meeting?

2              MR. DUNWOODY:  Same objection.

3         Q.    (BY MR. LACY:)  Will you tell me

4    anything that was said at that meeting?

5              MR. DUNWOODY:  Same objection --

6    Well, I guess you can go ahead and answer that one.

7         Q.    (BY MR. LACY:)  If you do, I'm going to

8    take the position you are waiving the privilege.

9              MR. DUNWOODY:  No.  You just asked

10   him, will you tell me anything that was said at

11   that meeting, and I think he can answer that yes or

12   no.  I don't think that calls for privileged

13   information.

14        Q.    (BY MR. LACY:)  Okay.  Would you tell

15   me anything that was said at that meeting?

16        A.    Not regarding what was discussed in

17   terms of your client.

18        Q.    Well, the meeting was solely about my

19   client, was it not?

20        A.    Yes, it was.

21        Q.    So there will be nothing else to tell

22   me, would you agree?

23        A.    I would agree.

24        Q.    All right.  In my client's termination

25   letter from Battelle a reason is given for his


                 RICHARD NEAL - by Mr. Lacy        51

1    Q.    Right.  They are above the group
2  managers.
3    A.    Right.
4    Q.    Who else?
5    A.    And the associate lab director.
6    Q.    Was there anyone below the group
7  manager level that would be considered a line
8  manager?
9    A.    No.
10    Q.    Okay.  So the lowest level of access to
11  this document you're talking about would be at the
12  group manager level?
13    A.    That's correct.
14    Q.    All right.
15    A.    Or in the H.R. copy, I had a copy of
16  it, of course.
17    Q.    Of course.  Now, being familiar with
18  the contents of this document and other rules and
19  regulations promulgated by Battelle, was there a
20  policy or regulation or rule that specifically
21  indicated that a person who did not maintain the
22  appropriate level of funding for projects for
23  themselves on projects was subject to discharge?
24    A.    Not to my knowledge.
25    Q.    Was there anything that you were aware

RICHARD NEAL - by Mr. Lacy          24

1    the function, he and I discussed different issues

2    of a human resource nature.  And he informed me

3    that there could be a possible problem with Mr.

4    Blackford.

5         Q.    Who was that?

6         A.    Walt Dascenzo.

7         Q.    Was there discussion between the two of

8    you about the possible whistleblower impact of Mr.

9    Blackford's performance issue?

10        A.    No.

11        Q.    Did you ever discuss with anyone the

12   possibility that there might be a whistleblower

13   issue pertaining to Mr. Blackford?

14        A.    Only after -- Well, yes.  The answer is

15   yes.  But it was after he had filed his

16   whistleblower complaint.

17        Q.    I understand that he filed his

18   whistleblower complaint, his initial complaint, --

19   Well, strike that.

20              You're talking about the formal

21   complaint under the CFR, after he was discharged,

22   or sometime prior to that time?

23        A.    Oh, it was before he was discharged.

24        Q.    I understand that in February, I think

25   it was February 21st of 1995 he wrote a letter to

RICHARD NEAL - by Mr. Lacy                    7

1    Congressman Hastings and followed that up with a

2    lengthy dissertation about his experiences at

3    Battelle where he alleges certain issues with

4    problems with diversity, problems with retaliation,

5    things like that.

6              Is that what you are referring to?

7    A.    Yes.  I received a copy of that.

8    Q.    He sent you a copy as part of his

9    presentation, so to speak, and distribution of that

10   document?

11   A.    Yes.  That's correct.

12   Q.    So it was at that time that you became

13   aware of the whistleblower issue.

14   A.    That's correct.

15   Q.    And did you understand that he was

16   doing that as a result of feeling that he was being

17   retaliated against in a performance evaluation

18   setting?

19   A.    Well, I don't know that I understood it

20   that way.  I understood that he had a whole bunch

21   of complaints, and they were included in there.

22   Q.    All right.  At that point did you begin

23   to individually communicate with Mr. Blackford

24   about his concerns?

25   A.    Mike -- I don't remember.  As a result


RICHARD NEAL - by Mr. Lacy                    8

(509) 735-2400   BRIDGES & ASSOCIATES   (800) 358-2345

1      Q.    With what?

2      A.    With his lack of understanding of the

3   guidance that he was being given by Jan Goolsby on

4   this project.

5      Q.    So what you witnessed was just a

6   reaction of frustration, indicating frustration, as

7   opposed to hostility towards somebody, huh?

8      A.    No.  I think there was some hostility

9   there, too.  I think he was very upset and

10  frustrated.

11     Q.    Who was he hostile to?

12     A.    He did not threaten anyone at that

13  meeting.

14     Q.    So he wasn't hostile to anybody in

15  particular, just generally hostile?

16     A.    I would say that.  He was very, very

17  upset, very agitated.  Mike is a very large person.

18     Q.    I know Mike.  Did he tell you he felt

19  he was undergoing harassment and reprisals of some

20  type during those meetings?

21     A.    No.  He did not indicate that he felt

22  he was undergoing reprisals.

23     Q.    Did he tell you, do you remember him

24  telling you in some memos through the computer that

25  he thought he was involved in a climate of

RICHARD NEAL - by Mr. Lacy                    15

(509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

1    harassment and reprisals?

2           A.    Yes.  I think Mike felt that way.

3           Q.    It looks like he communicated that to

4    you.  I am handing you Bates 361 and 362, this

5    document.  I have highlighted a couple of those

6    spots for you.

7                       (Pause in the proceedings).

8           Q.    Does that refresh your recollection

9    about whether he told you he felt he was a victim

10   of harassment and retaliation?

11          A.    Yes.  Mike was very much feeling that

12   he was being harassed and reprised against.  He

13   said this.

14          Q.    Now, apparently there was a suggestion

15   made, actually a request made to Dan Lowe with the

16   HEHF, I keep forgetting what that stands for.

17          A.    Hanford Environmental Health

18   Foundation.

19          Q.    I figured you would know.  There was a

20   request made for a fitness evaluation of Mr.

21   Blackford arising out of this review hearing where

22   you terminated the meeting, correct?

23          A.    Correct.

24          Q.    Did you support that request?

25          A.    Yes, I did.  It was my feeling that

RICHARD NEAL - by Mr. Lacy                16

(509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

1    of that specific letter that he sent, no, I did

2    not.   That was being handled at the time I think by

3    the Staff Concerns Office.   So I did not work with

4    him directly on those specific complaints at that

5    time.

6         Q.    Did you come to ever work specifically

7    with Mr. Blackford in trying to resolve or just

8    deal with him about complaints of his treatment at

9    Battelle?

10        A.    Yes, I did.

11        Q.    When did that occur?   When did you

12   first begin to work with him?

13        A.    When his supervisor, Jan Goolsby, put

14   him on an improvement required performance rating,

15   which necessitated the development of a career

16   development plan, improvement plan.

17        Q.    Was there a written policy or some

18   written protocol that required that?

19        A.    Yes, there was.

20        Q.    And was that like a policy in the human

21   rights department?

22        A.    Human Resources Department, yes.

23        Q.    Excuse me.   Human Resources

24   Department.   Did you consult with Mr. Goolsby about

25   the propriety of putting Mr. Blackford on an I.R.

1    good idea?

2         A.    I did not object to it.

3         Q.    You didn't tell him you thought it was

4    a good idea?

5         A.    I thought it was appropriate.

6         Q.    What specific input did you have in to

7    the decision to discharge Mr. Blackford?

8         A.    I was a part of the review process, and

9    we have a particular review process which uses a

10   personnel action review committee to review any

11   particular discharge situation.  I was a part of

12   that.  I was on that Park Committee.  I consulted

13   with Mr. Heister and his boss prior to that on the

14   appropriateness of this action.

15        Q.    His boss, being?

16        A.    Who's boss?

17        Q.    You said you consulted with Mr. Heister

18   and his boss, and I am saying his boss being who?

19        A.    His boss was Jerry Work.

20        Q.    So explain to me now the process that

21   actually was gone through for this decision to be

22   made to fire my client.

23        A.    The Park Committee is a committee that

24   is established by policy of Battelle, and it is a

25   recommending committee, recommending body.  It's

1    composed, the people that attend Park is the Level
2    I manager, who is Jerry Work; Earl Heister, who was
3    the line manager; myself; another Level I manager
4    not associated with the individual.  The human
5    resources director normally chairs it.  Affirmative
6    action people are there, or EEO.  And legal
7    counsel.  And this body reviews the situation and
8    makes a recommendation to the Level I manager.
9         Q.   Who's the Level I manager in this
10   situation?
11        A.   Jerry Work.
12        Q.   So the people that were participating
13   in this particular decision as far as you recall
14   were Jerry Work, Earl Heister, yourself, somebody
15   from the EEO, and legal counsel?
16        A.   The human resources director chairs
17   that group.
18        Q.   So who was that?
19        A.   I don't know if that was John Hirsch at
20   the time or Paula now Lenon.
21        Q.   Was there a record made of that Park
22   Commission meeting?
23        A.   Was there a record?  Yes.
24                  MR. LACY:  For the record, I have
25   not received anything in discovery --


RICHARD NEAL - by Mr. Lacy          48

**EXHIBIT**
2

```
 1      possibly the exclusion of the janitors and maybe some of
 2      the carpenters -- really has, is engaged at some point
 3      in the contracting process, whether it's to make a
 4      presentation, to help write a proposal, to completely
 5      write a proposal, or whatever.  So it's very difficult
 6      to explain, but it is definitely a distributed
 7      responsibility that everyone is aware of.
 8   Q. All right.  When you say it's difficult to explain,
 9      actually, that will lead into the next question I'm
10      going to ask you, and that is, is it explained or set
11      forth, this responsibility that everybody has to engage
12      in procurement activities, somewhere within the policies
13      or the written guidelines or in some fashion in writing
14      within PNL?
15   A. I guess I'd have to honestly say I don't know.  I mean,
16      I have been there so long, there have been so many
17      models associated with developing business, that what
18      I've told you is my impression of how the company
19      actually works.
20   Q. Sure.  After a while, when you've been in a place so
21      long, you no longer go look up the rules because you've
22      been doing it so long it's second nature?
23   A. That's true.
24   Q. All right.  I'm interested in this more because my
25      client wasn't a long-term employee of PNL, coming to
```

[MAHAN] -

1    work in August of 1992 and leaving there in August of

2    1997, so five, approximately five years.  Can you think

3    of some source that a person such as Mr. Blackford would

4    have had in order to be able to actually review the

5    rules, regulations, or guidelines that might be in

6    effect at PNL when it comes to procurement of funding

7    sources?  In other words, where could he have gone as a

8    new employee to have determined what those rules were

9    with respect to his responsibilities for procurement?

10   A.   Right.  Good question.  If I had a new employee sitting

11   in front of me today, besides verbally telling them what

12   to do, one, I would as a manager be prepared with a set

13   of briefing materials for that employee and a checklist

14   of things I should tell that employee.  I've not done

15   that in so long, I have no idea -- well, in fact, I

16   honestly don't know if it still exists, but it did exist

17   at one time.

18   Q.   These briefing materials that you are referring to that

19   you utilized with an employee, are they materials that

20   you would prepare or something that was already --

21   A.   No.  They would be prepared out of the Human Resources

22   organization.

23        MR. DUNWOODY:  And Bob, you need to make sure

24   you let him finish his question before you start

25   answering.

AFFILIATED COURT REPORTERS
509-966-6787

13

[MAHAN] -

1      receiving a memo like that?

2   A.  Absolutely the best of my knowledge, I never received

3      that memo.  I never received anything in writing with

4      that kind of an allegation.

5   Q.  You can rest a minute.  It might take me a while to find

6      what I'm looking for.

7              MR. DUNWOODY:  I'm looking for it too.  Let's

8      go off the record here.

9              MR. LACY:  Yeah.

10                    (AN OFF-THE-RECORD DISCUSSION WAS

11                    HELD.)

12  Q.  (By Mr. Lacy)  You apparently are looking at a document

13      that purports to be an E-mail, I guess it purports to be

14      an E-mail, copy of an E-mail dated April 9, 1997.  Does

15      that equate with what I think you are looking at?

16              MR. DUNWOODY:  Just to make the record clear,

17      what he's looking at is production Nos. JMB 308 through

18      309.

19  Q.  All right.  That's probably a good way to look at it.

20              This appears to be addressed to somebody named

21      Bob.  You are saying that's either not you or this

22      wasn't sent to you.  Is that your recollection?

23  A.  My recollection is I received no E-mail from Mike

24      Blackford on this subject.

25             And I guess I would say one more thing, is

[MAHAN]⁻

1      this thing looks just fishy as the devil.  Every other

2      E-mail I got from Mike in the header had:  To, my name,

3      the date, and the subject.  I don't understand why this

4      does not have the "to me."  Everything else he ever sent

5      me does, and I think the material you have will bear

6      that.

7   Q. Well --

8   A. I mean, if I didn't recall receiving this, I wouldn't

9      even have looked to see what the header looked like, but

10     there's something wrong with this message.

11  Q. I hear what you are saying, and what I'd like you to do

12     is kind of stick with your answers to the questions that

13     I ask; not that the information you give me is not

14     relevant, but it just goes in a different direction than

15     where I wanted to go.

16  A. Fine.

17  Q. All right.  Did you or did you not ever become aware

18     from any source that Mr. Blackford had discovered what

19     he thought were some discrepancies in the budget

20     forecast figures in connection with this UNICALL in the

21     spring of 1997?

22  A. Yes.

23  Q. When did you first find out about that?

24  A. It would have been in this time period.  I couldn't put

25     an exact date on it, but it would have been in this time

[MAHAN] -

1    little bit, but I believe the number of employees stayed
2    pretty constant.
3  Q.  And what was the specific job responsibility assigned to
4    you as manager of strategic programs at that time?
5  A.  I was responsible for the IMS support staff -- and that
6    really should be IMS staff because it's Information
7    Management Support staff.
8  Q.  So you are responsible for the IMS?
9  A.  Right.  I was responsible for all long-range planning.
10 Q.  And this is planning with respect to the internal
11    computers at the lab?
12 A.  Yes.
13 Q.  Okay.
14 A.  I was responsible for the DOE, Department of Energy
15    interface.
16 Q.  And that you are going to need to explain to me.
17 A.  Right.
18        MR. DUNWOODY:  But have you finished your list
19    of what your responsibilities were?
20 A.  Yes.
21        MR. DUNWOODY:  All right.
22 Q.  Even if you hadn't, I was going to have you explain to
23    me before you went to the next step, but go ahead.
24 A.  It's really complicated.  I was responsible for any
25    reporting to DOE -- well, let me back up a moment.  With

[MAHAN] -

1    regard the DOE interface, with regard to computing and

2    telecommunications, restricted to those two areas.

3  Q.  So that implies there was someone else that would be

4    responsible for interfacing with DOE with regard to

5    other issues?

6  A.  Facilities, power, whatever.

7  Q.  Whatever?

8  A.  Yes.

9  Q.  Okay.

10  A.  That included producing what I would consider to be

11    regular and ad hoc reports at their request, preparing

12    the annual DOE plan, approving the acquisition of

13    computing equipment, coordinating any external reviews.

14    That would include the Department of Energy, the

15    Inspector General, General Services Administration,

16    whoever had the legal right to provide oversight to the

17    laboratory.

18         I also maintained credibility with the local

19    DOE office and headquarters staff in computing, and that

20    probably covers it.

21  Q.  Okay.  It's not like it wasn't enough?

22  A.  It's sort of when DOE asks, I'm the guy that figures out

23    how to respond.

24  Q.  As it relates to computers and telecommunications?

25  A.  Yes.  Yes.

1   Q.   Okay.  Tell me what the DOE plan that you are talking

2        about was.

3   A.   There's an annual plan that at that time was mandated by

4        congress, or at least the DOE interpretation of it was

5        that it was mandated by legislation, and it was a rollup

6        of the cost of computing in the laboratory.  That got

7        rolled up by DOE and presented to OMB, and OMB presented

8        it to congress.

9   Q.   Does this have something to do with the term UNICALL?

10  A.   That was a later term.

11  Q.   For the same thing?

12  A.   No.  The UNICALL is a superset of that.  This was

13       primarily to produce information related to the budget

14       year.  Now, in the federal government, the year we're

15       working on that budget is like three years ahead of us,

16       and it's sort of for DOE to be able to report to

17       congress here's what DOE thinks they're going to spend

18       on computing, and it's simply a forecast.  And you might

19       well imagine, at that level it is really a forecast.  I

20       mean, it's sort of throw something on the wall.  It is

21       not a budget of any kind.

22  Q.   How does that differ from the UNICALL?

23  A.   It was integrated -- it previously was a completely

24       separate report, had no connection with the UNICALL

25       whatsoever, and the UNICALL did exist.  They were merged

[MAHAN]-

1   Q.   And who took over that?

2   A.   It was dissolved.

3   Q.   It was dissolved.  So just to try and stay on this

4        subject for a moment, in I believe the spring of 1997

5        there was some work done by Mr. Blackford with respect

6        to this forecasting function.

7   A.   Yes.

8   Q.   And were you the one who assigned him that work?

9   A.   Yes, I was.

10  Q.   And then you would have been his primary overseer with

11       respect to that work?

12  A.   Yes.  I had project management responsibility, yes.

13  Q.   Okay.  I want to come back to that issue later, but for

14       now I just want to get the players straight.  All right?

15  A.   Sure.  Yes.

16  Q.   The reporting function to DOE was important because they

17       were your -- at least one of your primary funding

18       sources; is that a true statement?

19  A.   That's true.

20  Q.   If they became dissatisfied in some fashion with the

21       services that they were receiving, that could impact the

22       budget of PNL?

23  A.   Yes.  Well, maybe I should retract that.  I can't -- you

24       can certainly make that conjecture and I would believe

25       it.  I have no evidence of that.

[MAHAN]

1   Q.  And who took over that?

2   A.  It was dissolved.

3   Q.  It was dissolved.  So just to try and stay on this

4       subject for a moment, in I believe the spring of 1997

5       there was some work done by Mr. Blackford with respect

6       to this forecasting function.

7   A.  Yes.

8   Q.  And were you the one who assigned him that work?

9   A.  Yes, I was.

10  Q.  And then you would have been his primary overseer with

11      respect to that work?

12  A.  Yes.  I had project management responsibility, yes.

13  Q.  Okay.  I want to come back to that issue later, but for

14      now I just want to get the players straight.  All right?

15  A.  Sure.  Yes.

16  Q.  The reporting function to DOE was important because they

17      were your -- at least one of your primary funding

18      sources; is that a true statement?

19  A.  That's true.

20  Q.  If they became dissatisfied in some fashion with the

21      services that they were receiving, that could impact the

22      budget of PNL?

23  A.  Yes.  Well, maybe I should retract that.  I can't -- you

24      can certainly make that conjecture and I would believe

25      it.  I have no evidence of that.

[MAHAN]-

1    Q.   You weren't a party to exactly what the numbers were?

2    A.   Right.

3    Q.   And how much of the money came from DOE as compared with

4         other sources; is that what you are saying?

5    A.   No.  I had a general knowledge of that.  But what I

6         really want to say is my primary job was to make sure

7         that DOE viewed us as a highly credible national

8         resource in computing and telecommunications.  If they

9         did not view us as that they got to be very, very

10        heavy-handed, and we'd fill out three times the number

11        of reports, and so on and so forth.  So it was very

12        important that DOE trusted us enough to give us a free

13        hand in doing what we felt we needed to do in computing.

14        So that was the real driver on me.

15   Q.   That's where you felt the pressure in terms of that

16        aspect of your job, correct?

17   A.   Yes.

18   Q.   Well, let me stay with this for a moment, then.  I

19        didn't want to cover this right now.  My mental process

20        was different.  But I think it makes sense to do it now.

21   A.   Okay.

22   Q.   In the spring of 1997, Mr. Blackford prepared and sent a

23        memo, I believe, to you outlining what he thought were

24        some potential discrepancies in the budget forecasting

25        data that he had been looking at.  Do you recall that,

[MAHAN] -

1   Q.   When you went to work for Battelle, was the entity that

2        you presently work for already known as Pacific

3        Northwest National Laboratories?

4   A.   No.  At that time it was called by various names,

5        Battelle Northwest, Pacific Northwest Division of the

6        Battelle Memorial Institute, and Pacific Northwest

7        Laboratory.

8   Q.   Now, this is purely educational for me, so this is what

9        I need to have you try to explain to me.  What is the

10       business of this entity that you went to work for in

11       1967, which is now known as Pacific Northwest National

12       Laboratories?

13  A.   Yes.  First I'll take the business the Battelle Memorial

14       Institute.  Battelle Memorial Institute, our parent

15       company, is a -- I'm not sure what the correct legal

16       term is.  It's either a nonprofit or not-for-profit

17       independent research laboratory.  Essentially, we have

18       no stockholders but we are a tax-paying entity, income

19       tax-paying entity.

20            Pacific Northwest Laboratories is a division

21       of the Battelle Memorial Institute.  That division holds

22       two contracts with the federal government, a contract

23       called the 1830 contract, which is for the operation of

24       the part of the Hanford site to perform research and

25       development for the Department of Energy; there's an

[MAHAN] -

1    1831 contract that is what is a use permit, that allows

2    the company to use government facilities, remunerating

3    the government for those facilities and for the use of

4    those facilities, and do work for other federal

5    agencies, private companies, or individuals.

6  Q.  So let's see if I understand this.  The 1830 contract

7    that you hold with DOE basically provides funding for --

8    can I call it PNL?

9  A.  Yes, that's fine.  That's colloquially -- well, the

10    "national" came in on an active basis several years ago,

11    but there are many people who still call it Pacific

12    Northwest Labs or Pacific Northwest National

13    Laboratories, yeah.

14  Q.  For ease of language, I'm just going to say PNL.

15  A.  That's fine.  I occasionally do it myself.

16  Q.  All right.  This 1830 contract essentially, then,

17    creates a funding source which is the Department of

18    Energy?

19  A.  Yes.

20  Q.  And the 1831 contract is an enabling contract that

21    allows you to have funding sources which are outside

22    funding sources?

23  A.  Yes.  Now, there's one intermediate.  Any other federal

24    agency can contract with us either under the 1830 or the

25    1831 contract.  If it's under the 1831 contract, it's

[MAHAN]

```
 1        deposition that I hadn't had a chance to fully review.

 2   A.   Uh-huh.

 3   Q.   And it's a file that you provided to counsel for

 4        Battelle for today's deposition, correct?

 5   A.   Uh-huh.

 6   Q.   Was this a file maintained by you personally?

 7   A.   Yes.

 8   Q.   And in the file, as I began to look at it, just the

 9        first page it contains a document, the first line of

10        which says, quote:  Contents of documentation file on

11        Mike Blackford.

12             Is that how you denominated this file,

13        documentation file on Mike Blackford?

14   A.   At the time that was written, yes.

15   Q.   All right.

16   A.   It now has more in it than that.

17             MR. DUNWOODY:  And I'd like you to -- that

18        document was produced to you as BMI 599 through 602.

19             MR. LACY:  Are you telling me that this was

20        part of the prior disclosures?

21             MR. DUNWOODY:  That's what I'm telling you.  A

22        lot of what's in that file is part of prior productions.

23             MR. LACY:  All right.  Actually, I wasn't

24        taking issue with that.  That wasn't important to my

25        question.
```

[MAHAN]

1   Q.   (By Mr. Lacy)   This document is dated November 10, 1993.

2        Is that the date that you created the document that

3        counsel just referenced?

4                 MR. DUNWOODY:   Well, I don't think he has

5        seen -- if you want to show him that document, that's

6        fine.   You can ask him about that.

7                 MR. LACY:   Well, that's what I was doing,

8        counsel, was asking him about the document.

9                 MR. DUNWOODY:   Well, you were asking what I

10       just referenced, and I think you ought to show him that

11       one, because I don't think he can say he's seen a

12       document with those production numbers on it.

13  Q.   (By Mr. Lacy)   Well, let me show you this document that

14       I have described as the contents of documentation file

15       on Mike Blackford.

16  A.   Right.

17  Q.   And it appears to be a numbered list of some kind.

18  A.   Right.

19  Q.   Of contents of a file.

20                All right.   Is the file that you turned over

21       to counsel for Battelle today, the one that was provided

22       to me this morning, is that the documentation file on

23       Mr. Blackford or does that have reference to some other

24       file?

25  A.   No.   This refers to that file, but things have been

AFFILIATED COURT REPORTERS
509-966-6787

[MAHAN] -

1     added to that file since this date.

2  Q.  Since November 10, 1993?

3  A.  Yes.

4  Q.  All right.  So that we're clear on this, the file

5     denominated documentation file on Mike Blackford which

6     you provided to counsel for Battelle today and was

7     provided to me today was maintained by you exclusively?

8  A.  Yes.

9          MR. DUNWOODY:  He provided it to me yesterday,

10     not today.

11          MR. LACY:  All right.  I think the record will

12     reflect that.

13  Q.  (By Mr. Lacy)  Now, did anyone, had anyone at Battelle

14     asked you to maintain a documentation file on Mike

15     Blackford?

16  A.  No.

17  Q.  Why did you do that?

18  A.  It was very clear that -- good management says if

19     anybody gets in enough trouble, that they are potential

20     candidates to be fired.  It better be well documented.

21     And by this time it was very clear to me that Michael

22     had alienated a great number of people and that I had

23     better at least try to put what information I had in

24     some kind of order, and that's what I did.

25  Q.  At the time that you did that in November of 1993, were

[MAHAN] -

1       you involved with Mr. Blackford directly as his

2       supervisor?

3    A. No, I should not have been by then.  He should have gone

4       on to Goolsbey by that time.

5    Q. Did you have any discussion with anyone else in the

6       workplace about the need for you to put together this

7       file or organize documentation that you had on Mike

8       Blackford?

9    A. I've had general discussions.  I don't recall if I had

10      an explicit discussion.  I had general discussions with

11      HR people.  HR people in this case would be Linda

12      Matheson.  And Linda Matheson was always a stickler for

13      if you have problems with any staff that are going to be

14      associated with not getting good salary increases or

15      getting no salary increase or possibility of discharge,

16      you'd better have the file well documented for that, and

17      this was in that context.  Linda may or may not have

18      told me:  Mike's in trouble.  You ought to do it.  You

19      ought to get the documentation squared away.  I can't

20      honestly --

21   Q. Did you feel an obligation in some fashion to the Human

22      Resources Department to document issues with respect to

23      Mike Blackford in some capacity other than as a line

24      manager?

25   A. No, I don't.  No.

[MAHAN] –

1   Q.   You were not his line manager at the time that you began

2        this documentation project, correct?

3   A.   That's right.

4   Q.   Have you ever begun a documentation file on any other

5        employee at Battelle that you weren't directly involved

6        in supervising?

7   A.   No.  But understand in this case, I was involved

8        directly in supervising him.  This documentation listing

9        covers the events when he was under my supervision.

10  Q.   It also covers events when he was no longer under your

11       supervision, correct?

12  A.   Well, when I decided to do it, I just took the whole

13       file and wrote it, and I cannot tell you whether it

14       covers events that were -- well, certainly I can tell

15       you that, because it had the original job description

16       that Lee Ann handed me, so it certainly had stuff from

17       before he worked for me.  I can't tell you whether it

18       had stuff after.  The file that I turned over did

19       because Mike made some things available to me, and I

20       just stuck them in the file and I did not list them or

21       attempt to interpret them.

22  Q.   Did you ever tell Mr. Blackford that you were

23       maintaining a documentation file on him independent of

24       the Human Resources Department?

25  A.   No.

[MAHAN] -

1    Q.   Is there any policy or directive that you'd ever

2         received in writing from anyone at PNL telling you that

3         it was your responsibility to document or create

4         independent files on employees for disciplinary

5         purposes?

6    A.   I'm not sure what you mean by independent files other

7         than --

8    Q.   I'm referring to this file as an independent file; for

9         example, independent from his personnel file that would

10        relate to his performance at Battelle.

11   A.   No.

12   Q.   Do you know of any written or unwritten policy at PNL

13        that would have required you to do this?

14   A.   No.

15   Q.   Did you do it out of some sense of loyalty to PNL?

16   A.   I did it out of self-interest, so I would have a record

17        of what I had in there and what I thought had gone on.

18   Q.   What sense did you feel a need to do this out of

19        self-interest?

20   A.   Well, simply I think it's good management practice to

21        keep -- I do not keep a logbook of my daily activities

22        like they do in the White House, but I thought enough

23        had gone on that it just might be a bright thing to do,

24        to write down what I knew about events that had

25        occurred.

**EXHIBIT**
*3*

1        Q.    Now, did you and Mr. Heister also have

2    contacts on a social level in addition to your

3    contacts with him on the job, you know, on a

4    professional level?

5        A.    Yes.  We went hunting, deer hunting, on

6    maybe three occasions.

7        Q.    These are like trips to some other

8    geographic location?

9        A.    Yes.  North of Spokane.

10       Q.    Okay.  And then on those occasions I

11   assume you camped out or took a trailer or

12   something?

13       A.    Yes.

14       Q.    And your stays lasted, what, several

15   days on each occasion?

16       A.    We normally left on Friday and came

17   back on Sunday.

18       Q.    Shoot anything?

19       A.    I didn't, no.

20       Q.    Did those three occasions occur in

21   three successive years, three successive hunting

22   seasons?

23       A.    No.  Actually, they were all in the

24   same season, I believe.  Yes, that's true.

25       Q.    And do you recall what year, what


                DARREN CURTIS - by Mr. Lacy            44

1  season that was?

2       A.  ·  I believe it was '97.

3       Q.   So we're talking about the winter

4  of '96-'97?  I assume the deer season occurs in the

5  wintertime.

6       A.   Yeah.  I'm not sure it it was in the

7  fall of '96 or the fall of '97.

8       Q.   Okay.  Was there ever any discussion

9  about your deer hunting trips with Mr. Heister that

10  involved Mr. Blackford?

11      A.   Yes.

12      Q.   And what do you recall about that?

13      A.   I initiated that, and asked him if he

14  had found work for Mr. Blackford or what the

15  situation was.

16      Q.   All right.  So this would have been

17  during the course of your interaction on the

18  hunting trip?

19      A.   It was on the ride up.

20      Q.   On the ride.  All right.  Since Mr.

21  Blackford left Battelle before the fall of 1997,

22  does that help refresh your recollection as to when

23  this trip might have been?

24      A.   No.  Because it may have been after he

25  left and I just asked if, you know, he had ever

DARREN CURTIS - by Mr. Lacy          45

1    question for you is, did you compose that language?

2                    MR. DUNWOODY:  Are you referring to

3    the bold language on Exhibit 3?

4                    MR. LACY:  I'm referring to both,

5    because they both contain the same language.

6                    MR. DUNWOODY:  Well, Exhibit 3 has

7    a paraphrase in bold, of some of the language in

8    Exhibit 2.  And there is also other language on

9    Exhibit 3 that seems to be describing the bold

10   language.  So I think you need to be clear about

11   what text you are asking about.

12            Q.    (BY MR. LACY:)  May I see Exhibit 3.

13   I'm certainly not trying to be unclear.

14                   All right.  Let's use Exhibit Number

15   3.  On Exhibit Number 3 there is some language that

16   is in bold.

17                   Do you see that?

18            A.    (Witness nodded affirmatively).

19            Q.    There is some other language that is

20   not in bold.

21            A.    Yes.

22            Q.    My question for you is, looking only at

23   the language which is in bold, did you compose that

24   language.

25                        (Pause in the proceedings).


                     DARREN CURTIS - by Mr. Lacy           55

         (509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

1          MR. LACY:  All right.  I will

2   accept that correction.

3          Q.    What was the basis of your knowledge

4   that Mr. Blackford ever spent eight hours a day

5   engaging in the activities of posting messages,

6   talking about perceptions-of-problems in the hall—

7   and complaining about never having enough funding

8   to get his work done?

9          A.    My first-hand knowledge of observing

10  Mr. Blackford in our building either out back,

11  smoking cigarettes, talking to people, in other

12  people's offices, talking to them, keeping them

13  from their work, and always complaining about never

14  being able to find enough funding, and not having

15  work.

16         Q.    Did you ever observe Mr. Blackford over

17  an eight-hour period?

18         A.    Do you mean constantly walking behind

19  him?

20         Q.    Enough so that you would know that he

21  spent eight consecutive hours at any time doing

22  those activities that you talked about.

23         A.    I would come to work in the morning and

24  see him out back smoking.  I would walk by an hour

25  later and see him still out smoking, still talking

1    to the same person.  I would see him in people's
2    offices in passing, conversing, come back an hour
3    to two hours later, and him still being there.
4           And the reason I have first-hand
5    knowledge of that is because I would walk in and
6    talk to the other person, the other office-mate,
7    and ask them, "Has this person been here the whole
8    time?"  And them replying, "Yes."
9           So I do have first-hand knowledge of
10   this individual, Mike Blackford, wasting a
11   considerable amount of time during any given day.
12        Q.   My question again for you is did you
13   ever observe him consistently enough over an
14   eight-hour period to be able to be confident that
15   he had done that for a full eight hour period?
16        A.   No.
17        Q.   By the way, were you ever aware of any
18   instructions given to Mr. Blackford to spend time
19   talking to people in order to try to obtain funding
20   for projects?
21        A.   Can you repeat that, please?
22        Q.   Did anyone ever tell you that Mr.
23   Blackford had been instructed at any time to
24   actually spend time conversing with people in an
25   attempt to get funding, project funding for

1    himself?

2         A.    I believe I had a conversation with Mr.

3    Heister, and he led me to believe that he had

4    instructed Mike Blackford that he needed to find

5    his own work or he would be let go.  And that Earl

6    would work for a year with him to help him find

7    work.  But after that he was on his own.  And if he

8    couldn't find work in another year, he would be let

9    go.

10        Q.    Mr. Heister gave you this information

11   toward the beginning of this process, at the

12   beginning of this first year so that you would know

13   that Mr. Blackford was on this program?  Is that

14   true or untrue?

15        A.    I do not recall exactly when Mr.

16   Heister gave me that information.  It may have been

17   after Mr. Blackford was let go, it may have been

18   during the discussion that he had with me on trying

19   to get work for Mr. Blackford.

20        Q.    You can't recall whether or not it was

21   before or after Mr. Blackford departed from

22   Battelle?

23        A.    No.

24        Q.    Would it have made any difference to

25   you in your observations of Mr. Blackford, going

DARREN CURTIS - by Mr. Lacy          62

(509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

```
1    around, spending all day talking to people, if you

2    had known that he was under a program that required

3    him to go around and talk to people to try to get

4    funding for projects?

5         A.    Well, the problem was partially that he

6    was talking to people that had no funding or any

7    work source to give him funding.

8         Q.    How do you know that?

9         A.    Because the person that he routinely

10   conversed with was not a project manager or -- They

11   were just a worker.

12        Q.    You weren't a project manager when Mr.

13   Heister came to you and asked you if you had work

14   for Mr. Blackford, were you?

15        A.    I do not recall.

16        Q.    I think you testified earlier today

17   that you think you might not have been.

18        A.    I may not have been.  That's true.

19        Q.    So it wasn't only project managers that

20   had work for people, was it, sir?

21        A.    No.

22        Q.    In the --

23        A.    Can I go on the record and say --

24        Q.    You can say whatever you want in

25   response to my question.  So if this is responsive
```

1          Q.    Did you ever hear that she was upset or

2    concerned about the amount of time that Mr.

3    Blackford spent speaking with her?

4          A.    No.

5          Q.    Your next statement in this, what did

6    we call this, it is not an E-mail?

7          A.    A news posting.

8          Q.    A news posting.  It's done with a

9    computer and you sent it into a distribution --

10         A.    Yes.

11         Q.    -- to other employees, correct?

12         A.    It's a bulletin board system.

13         Q.    Like a chat room on the Internet,

14   except with a smaller distribution?

15         A.    No.

16         Q.    No?  Okay.  Well who has access to this

17   when you send these things out on the PNL

18   Biz.letstalk?

19         A.    Anyone that wants to read.  Anyone at

20   Battelle that subscribes to that news group will be

21   able to read it.  It's just as if you were walking

22   down the hall and were looking at a bulletin board

23   all the time.  You would have to make that effort

24   to go read it.

25         Q.    You would basically punch up PNL Biz


                  DARREN CURTIS - by Mr. Lacy          66

1    dot Let's Talk on your computer and see what was
2    there?
3         A.   Yes.
4         Q.   And to your understanding what
5    percentage of employees at Battelle have the
6    practice of participating in this PNL dot Biz dot
7    Let's Talk?
8         A.   It's impossible for me to know that.
9    Thousands of people could read it and you'd never
10   know it.  But whoever posts, whoever comments,
11   whoever replies to a message, that's the only way
12   you can tell if they are actually participating, or
13   if they are just reading.
14        Q.   Is there any prohibition that you are
15   aware of at Battelle about spending time during
16   work hours posting messages on this bulletin
17   board?
18        A.   No.  This forum was established to
19   allow staff to have an open forum to openly
20   communicate about problems or good things or
21   whatever.
22        Q.   Like a stress reliever?
23        A.   I'm not sure if that was the intent.
24   It was mostly to give people an opportunity to
25   voice their opinion.


                 DARREN CURTIS - by Mr. Lacy          67

1      Q.   Sound off if they wanted to?

2      A.   Yes.

3      Q.   So if someone used this process to

4  sound off and complain, it wasn't considered

5  inappropriate?

6      A.   No.

7      Q.   So, if Mr. Blackford used it to sound

8  off and complain, it wouldn't be considered

9  inappropriate just because he was complaining or

10 because there was negative tone to his comments?

11     A.   Sarcasm and exaggeration are typically

12 apparent in these postings.  And this reply was to

13 Dwight for his sarcastic and negative comments

14 about a very positive thing.

15     Q.   You have, I take it, a recollection of

16 the context of this communication?

17     A.   Yes.

18     Q.   What was it that Mr. -- What was

19 Dwight's name?  Mr. Hughes?

20     A.   Dwight Hughes, yes.

21     Q.   What was it that he had said that had

22 prompted this response on your part?

23     A.   The Battelle Staff Association, which

24 is BSA, routinely has, they used to call them

25 attitude adjustment parties.  They called them pizza

DARREN CURTIS - by Mr. Lacy          68

1    parties or something like that.  And they had a big

2    party for all staff, whoever wanted to attend, to

3    attend at this pizza function -- or maybe it wasn't

4    a pizza function, maybe it was a cookout,

5    hamburgers and hot dogs type outing at the Battelle

6    park.  I'm not sure what it's called.  By the

7    tennis courts.

8            And Dwight was upset because it was on

9    a Friday, and his kids had -- he had obligations

10   with his kids, and he felt it was more appropriate

11   that the staff association distribute pizzas to all

12   the buildings so that everyone could partake in

13   this, because these funds are collected from, I

14   don't know where the funds come from for this,

15   whether it is Battelle internal or wherever, but he

16   felt that he didn't get his share of the fund, and

17   because he had obligations, he couldn't make it.

18           So there were responses back that said,

19   you know, that you had the opportunity to come and

20   you had other choices that you made.

21           His complaint that the staff

22   association should go out of their way and make it

23   available in every person's building didn't hold

24   water because not all staff in every building would

25   be able to come to the function anyway.


DARREN CURTIS - by Mr. Lacy          69

1    And in addition, one of the purposes, I

2  feel, about the parties is to get people together

3  from different organizations so that they can

4  network, communicate and in a sense build working

5  relationships that would not normally be

6  established.  And it gives us the opportunity to

7  see people that we haven't seen for years.

8    Q.    All right.  So you responded to him

9  with this example of Mr. Blackford's waste because

10  you wanted to give an example of somebody who, like

11  Dwight, had spent more time analyzing the problem

12  than it was worth.

13    Is that a fair statement?

14    A.    Yes.

15    Q.    All right.  Earlier in my questions to

16  you you had said that you didn't have a

17  recollection of problems with Mr. Blackford's

18  personal behavior, other than his wasting time and

19  things like that.

20    Does this refresh your recollection

21  that you had some concerns about some other aspect

22  of his behavior?

23    A.    I'm not sure I follow.

24    Q.    For example, his propensity to

25  overanalyze a problem to the point that it made it

1    cost inefficient.

2          A.    I'm not sure how to answer that.  Since

3    he was always complaining about things.  I can

4    conceive of complaining as analyzing.  When I

5    complain about something, it's normally because

6    I've analyzed it enough to figure out there's a

7    problem with it.  But if you overanalyze something,

8    you're just spinning your wheels.

9          Q.    By that time, in September of 1997, had

10   you already gone on your hunting excursions with

11   Mr. Heister?

12         A.    I'm not sure.

13         Q.    Assuming that you had not, since you

14   think you might not have, what would have been the

15   source of your understanding that Mr. Blackford had

16   a propensity to overanalyze to a cost inefficient

17   extent in the workplace?

18         A.    The meetings that we had for project

19   kick-offs, Mike tended to overanalyze problems.

20   Instead of focusing on the problem in terms of how

21   to solve it, he would just focus on the problem.

22         Q.    Now, your next statement that you make

23   here, and I'll quote it, is, "Some of these people

24   no longer work at PNNL now that it only takes two

25   years of record keeping (and not an act of

1   Congress) to fire them."

2             Was that a reference to Mr. Blackford?

3        A.   No, not specifically.   It was a

4   long-standing joke of mine.   Early on at Battelle

5   it didn't really matter what you did.   To get fired

6   seemed like it took an act of Congress.   And we

7   joked about that because a lot of our budgets come

8   from Congress.   And so some of the bigger projects

9   are actually line items on Congressional committee

10  forms.   And so we have to have Congress' support to

11  get the project off the ground.

12        Q.   Your next statement was, "The cost of

13  firing a person like this amounts to two years

14  direct charges to clients (or overhead), their

15  managers lost time, project deliverables slipping,

16  and all the other PNNL staff who wasted their time

17  engaging in idle chitchat.   For an S & E III this

18  amounts to about $500K," which you would agree

19  means $500,000.

20        A.   Yes.   I would agree that that $500K is

21  $500,000.

22        Q.   All right.   Is that statement about Mr.

23  Blackford?

24        A.   Partially.   Partially to another

25  person.

DARREN CURTIS - by Mr. Lacy          72

1    Q.  What was it referring to as far as -- I

2 mean, in what way was it referring to Mr.

3 Blackford, what portion of it?

4    A.  This is my response to Dwight Hughes'

5 overanalyzation of a situation, and this is my

6 overanalyzation of how much it would cost to fire a

7 person, assuming that they did nothing but waste

8 eight hours a day posting messages, talking about

9 their perception of the problem, and keeping other

10 people from their work, and just complaining about

11 everything.

12    So, given those, we are scientists,

13 most of us that discuss this, so we assume certain

14 things.  Given those assumptions, if you take a

15 person's chargeout rate, which of an S & E III is

16 approximately a hundred dollars an hour, and we

17 work approximately 50 weeks out of the year times

18 40 hours a week, amounts to 2,000 hours, which at a

19 hundred dollars, I'm not sure I'm doing the math

20 right, but taking their direct time and their

21 chargeout rate plus their manager's lost time,

22 having to deal with them several hours a week, and

23 taking into account that project deliverables would

24 be slipping because this person wouldn't be pulling

25 their weight, and then all of the other PNNL staff

1    that are affected by this person would also make

2    their deliverables slip, this was an estimation

3    that I came up with on how much it would cost to

4    get rid of this person over a two year period of

5    time, assuming that they never made any progress.

6         Q.    Was it also your assumption that you

7    would need to go through a two-year period of

8    record keeping in order to effectuate your intent

9    of discharging this person?

10        A.    My understanding is that if a person

11   does not pull their weight and they do not meet

12   these expectations, that management is put in a

13   position that they have to follow some course of

14   action to either help this staff improve their

15   performance to the point where they're no longer

16   having to be hand held, or at some point in the

17   future if the staff does not improve their

18   performance, management has no other choice but to

19   let them go because he can't find work for them.

20        Q.    Would you agree with me, Mr. Curtis,

21   that the implication of what you wrote here is that

22   there would be an attempt to spend two years going

23   through the process of record keeping in order to

24   accomplish the purpose of firing the person?

25        A.    I don't think the purpose of keeping

1      the records is with the intent to fire the person.

2      I think keeping the records is the intent on

3      helping the person through the process and

4      recording the process.

5          Q.    And just so we're clear, you don't

6      think that the implication that I just described is

7      present in what you wrote?

8          A.    I'm sorry.  I didn't follow that.

9          Q.    I said you don't think that the

10     implication that I was just talking about, the

11     implication that you were starting out doing record

12     keeping for two years in order to achieve the

13     discharge of the person, is present or made by the

14     language that you wrote?

15         A.    Again, this posting was an

16     exaggeration --

17         Q.    I think you can answer that question

18     yes or no.  You either think it is present and

19     implied there, or you don't.

20         A.    I'm not sure I understand what you're

21     really asking me, sir.

22         Q.    I want to know, you're the author of

23     this, as you look at it and you read it, do you

24     agree that the implication from the language

25     objectively there is that a record keeping for two

DARREN CURTIS - by Mr. Lacy          75

(509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

1    years is being done in order to achieve the

2    objective of firing someone?

3         A.    My intent was to exaggerate that it no

4    longer takes an act of Congress but managers have

5    to do their job and do record keeping and go

6    through a process that's two years long to try to

7    help a person to keep from getting fired, but at

8    the end of the two year period the record keeping

9    is basically their defense for firing a person.

10        Q.    Again, when you say it only takes two

11   years of record keeping to fire them, you disagree

12   that that implies that the purpose of the record

13   keeping is to fire them?

14        A.    Well, the problem I'm having is that

15   this was written in a flippant and sarcastic and

16   negative tone.  So therefore it can imply anything

17   negative that you try to read into it.

18        Q.    You were the author, sir.

19        A.    I was the author.

20        Q.    My question now is, wasn't it your

21   intent to imply that the purpose of the two years

22   of record keeping was to fire the person involved?

23             MR. DUNWOODY:  And I think he's

24   already testified as to what his intent is.  So I

25   object that it's been asked and answered.


             DARREN CURTIS - by Mr. Lacy          76

1           MR. LACY:  That's a good objection,

2    but not the rest of it.

3           Q.    You get to answer it again.  Are you

4    telling me that it was not your intent to imply

5    that the two years of record keeping on this

6    unidentified person was for the purpose of firing?

7           A.    I'm not sure that was my intent.

8           Q.    All right.  Now, you say in the last

9    sentence there, "For an S & E III this amounts to

10   about $500,000."

11          Why did you use the term an S & E III

12   in that context, sir?

13          A.    Because the chargeout rate for an S & E

14   III is around a hundred dollars an hour.

15          Q.    Why did you choose an S & E III for

16   your calculation as opposed to some other employee,

17   like an S & E IV, an S & E II, an S & E I or a

18   project manager?

19          A.    Because I believe Mr. Dwight Hughes and

20   Mr. Bill Richmond are both S & E IIIs.

21          Q.    Were you implying that one of them

22   ought to be considered in light of these comments

23   of yours for potential discharge?

24          A.    No.  What I was implying, that an S & E

25   III makes about a hundred dollars an hour in this


           DARREN CURTIS - by Mr. Lacy            77

1   analysis.

2         Q.    Sir, isn't it true, to get right to it,

3   that the S & E III that you were thinking of when

4   you wrote this was Mr. Blackford?

5         A.    And also another person that was let

6   go.

7         Q.    And who was that person?

8         A.    His name is David Schreck.

9         Q.    When was Mr. Schreck let go?

10        A.    I'm not sure.  He was a good friend of

11  ours, of my wife and mine.

12        Q.    Did you have some knowledge that Mr.

13  Schreck had endured a two-year period of record

14  keeping, or that someone had, in order to fire

15  them?

16        A.    I'm sorry.  I apologize.  He was not

17  let go.  He was in the middle of the process, and

18  left of his own accord.

19        Q.    My question is, did you have some

20  knowledge from some source, whether it had been

21  objective or hearsay, that there had been a period

22  of record keeping engaged in for the purpose of

23  getting rid of Mr. Schreck?

24        A.    Again, the record keeping is not to get

25  rid of a person.

                    DARREN CURTIS - by Mr. Lacy        78

        (509) 735-2400  BRIDGES & ASSOCIATES  (800) 358-2345

1     Q.    Were you aware that there had been a
2   period of record keeping begun with respect to any
3   disciplinary or corrective process concerning Mr.
4   Schreck?
5     A.    Corrective process, yes.  Mr. Schreck
6   informed us that he had received improvement
7   required on his staff evaluation and that he was in
8   the process of working with his managers and that
9   they were keeping records of his progress.
10    Q.    All right.  Mr. Curtis, you're telling
11  me now that the aim of this was to describe two
12  individuals that you had in mind.
13          Correct?
14    A.    The intent of this message was to poke
15  fun at, take a shot at Mr. Dwight Hughes.
16    Q.    But when I asked you about who you had
17  in mind as the S & E III, you said you had in mind
18  two individuals, Mr. Blackford and Mr. Schreck.
19  Correct?
20    A.    Well --
21    Q.    Is that correct or incorrect?
22    A.    I had those two people in mind.
23    Q.    All right.
24    A.    But that's not the reason I chose S & E
25  III,

                  DARREN CURTIS - by Mr. Lacy          79

1       Q.     In fact, the very next sentence kind of

2   belies that, wouldn't you agree, when you say,

3   "This is not mainly aimed at Dwight but is mainly

4   aimed at one," not two but one, "individual that no

5   longer works at PNNL"?

6       A.     Mainly.

7       Q.     And who was that, sir?

8       A.     That individual would be Mike

9   Blackford.

10      Q.     Other than Mr. Heister, to whom had you

11  spoken about Mr. Blackford in attempts to get him

12  corrected or disciplined or fired prior to writing

13  this E-mail?  Excuse me.  This posting.

14      A.     You're asking me who I talked to about

15  Mr. Blackford's corrective actions?

16      Q.     Yes.

17      A.     My wife.

18      Q.     All right.

19      A.     Those were my personal feelings.

20      Q.     Did your wife give you any information

21  that you considered valuable that you didn't

22  already have from your personal observations?

23               MR. DUNWOODY:  You can choose

24  whether or not to answer that question, if you want

25  to assert your marital community.

                DARREN CURTIS - by Mr. Lacy           80

        (509) 735-2400   BRIDGES & ASSOCIATES   (800) 358-2345